# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

```
_____
                               :
MARCEL WINDT and               :
E.T. MEIJER,                   :
                               :   Civil Action No. 04-3026 (GEB)
               Plaintiffs,     :
                               :
        v.                     :       R E-I S S U E D
                               :       O P I N I O N
QWEST COMMUNICATIONS           :
INTERNATIONAL, INC., et al.,   :
                               :
               Defendants.     :
_____:
```

## THIS OPINION IS BEING RE-ISSUED FOR THE PURPOSES OF PUBLICATION
### Typographical corrections entered have no bearing
### on the holding and dicta contained herein

APPEARANCES:

MELVYN H. BERGSTEIN, Esq., WALDER, HAYDEN & BROGAN
5 Becker Farm Road
Roseland, New Jersey 07068
Attorney for Plaintiffs[1]

THOMAS R. CURTIN, Esq., GRAHAM, CURTIN & SHERIDAN, PC
4 Headquarters Plaza
P.O. Box 1991, Morristown, New Jersey 07962
Attorney for Defendant Qwest Communications International, Inc.

ANDREW T. BERRY, Esq. and JOSEPH T. BOCCASSINI, Esq.,
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
P.O. Box 652, Newark, New Jersey 07101
Attorneys for Defendants John A. McMaster and Robert S. Woodruff

JOEL M. SILVERSTEIN, Esq., STERN & KILCULLEN
75 Livingston Avenue
Roseland, New Jersey 07068
Attorney for Defendant Joseph P. Naccio

---

[1]  Plaintiff J.C. van Apeldoorn was replaced by Plaintiff Marcel Windt causing the caption in this action to be changed accordingly.

**GARRETT E. BROWN, Jr., Chief Judge**

This matter is before the Court on Defendants' motions to dismiss Plaintiffs' complaint (hereinafter "Complaint") on the grounds of forum non conveniens.[2]

The procedural history of the case, while lengthy, appears to have little bearing on the issue at bar. Therefore, it shall suffice to note that the Complaint (seeking a jury trial and alleging numerous claims related to securities fraud, breaches of fiduciary duty and various forms of intentional misrepresentation) was filed on June 29, 2004, see Docket Entry No. 1, and this Court issued an order dated June 17, 2005, refusing to compel arbitration and stay the instant proceedings. See Docket Entry No. 46. Following this decision, Plaintiffs sought discovery, see Docket Entries No. 53, 59, 75-76, and limited discovery was conducted. On

---

[2] An amended complaint was filed on September 21, 2006, upon substitution of J.C. van Apeldoorn by Marcel Windt. See Docket Entry No. 81. As in the original Complaint, the Amended Complaint seeks: (1) damages equal to the liquidation deficit of the bankruptcy estate, (2) treble damages, pursuant to 18 U.S.C. § 1964, (3) punitive damages in the amount determined by the jury, and (4) costs and expenses in bringing this action, together with attorney's fees. See Docket Entries No. 1 at 124-25, and 81 at 174-75. Although Plaintiffs' Amended Complain exceeds Plaintiffs' original Complaint by fifty pages, compare Docket Entries No. 1 and 81, Plaintiffs' Amended Complaint effectively repeats the statements made in Plaintiffs' original Complaint with respect to the issue of forum non conveniens, see Docket Entries No. 1 at 11-12, and 81 at 9-10. The enlargement of Plaintiffs' pleading is a result of Plaintiffs' elaboration on the facts supporting Plaintiffs' claims under 18 U.S.C. § 1964. Therefore, for the purposes of the instant Opinion and accompanying Order, there is no distinction between the Amended and original Complaints.

February 21, 2006, Defendant Qwest Communications International, Inc. (hereinafter "Qwest") filed the instant motion (hereinafter "Motion"), see Docket Entry No. 66, and on April 13, 2006, the remaining Defendants filed their joint statement in support of Qwest's Motion to dismiss Plaintiffs' Complaint. See Docket Entry No. 68. Plaintiffs filed their opposition to Qwest's Motion (hereinafter "Opposition") on April 18, 2006, see Docket Entry No. 69, and Qwest filed its reply (hereinafter "Reply") on May 10, 2006. See Docket Entry No. 71.

The matter was transferred to the undersigned on August 7, 2006. This Court has reviewed all documents filed and submitted, and has decided the pending motions without oral arguments pursuant to Rule 78 of Civil Procedure. For the following reasons, Defendants' motions to dismiss will be granted.

## BACKGROUND

Plaintiffs are Dutch attorneys acting as bankruptcy trustees after being appointed by a Dutch court to represent the estate of (a) KPNQwest N.V. (hereinafter "KPNQwest," a Dutch corporation established as a joint-venture between Koninklijke KPN N.V., a telecommunication company having its seat in Hoofddorp, Netherlands, and Qwest, a Delaware-incorporated entity having its principal place of business in Denver, Colorado), and (b)

KPNQwest's wholly-owned Netherlands-based and European subsidiaries.[3] See Compl. ¶¶ 1, 3, 20-22.

Plaintiffs brought this action against four identified Defendants, namely, Qwest, two former KPNQwest's directors and KPNQwest's former CEO.[4] See id. ¶¶ 22-25. In their Complaint, Plaintiffs alleged that KPNQwest was injured by "fraud, deceit, corporate mismanagement and other misconduct of Defendant[s]," id. ¶ 1, and clarified that (a) "Defendants' fraud and mismanagement result[ed] in KPNQwest's resulting increasing insolvency and bankruptcy," id. at 67-96, and (b) KPNQwest's injuries were amplified by Defendants' "fraud and looting."[5] Id. at 97-103. Plaintiffs based their choice of venue on the domicile of two Defendants, that is, KPNQwest's former CEO and one of the directors, and asserted that the United States was the proper forum because:

---

[3]

The total number of these entities appears to be around 130. See Compl. ¶ 20. KPNQwest offered its services in 15 European countries. See id. ¶ 21.

[4]

Plaintiffs also named defendants 1-10 who, three years after initiation of this action, (a) remained unidentified by Plaintiffs, and (b) were not served by Plaintiffs. It appears from Plaintiffs' Opposition that Plaintiffs could eventually decide to name "all relevant current and former Qwest employees responsible for fraud" as such defendants, see Opposition at 23-24; however the record reveals that Plaintiffs neither named these parties as defendants nor served them. In view of this Court's decision to grant Defendants' Motion, this Court dismisses Plaintiffs' claims against Defendants 1-10 for lack of prosecution.

[5]

On September 21, 2006 Plaintiffs filed their Amended Complaint (hereinafter "Amended Complaint"), which elaborated on the very same alleged wrongdoings.

(1) "[s]ignificant U.S. interests are at stake in this dispute [since] much of the . . . alleged [wrongdoing] occurred in the United States"; (2) four KPNQwest Board meetings took place somewhere in the U.S.; and (3) while being at unidentified locations somewhere in the U.S., Defendants participated in five conference calls of non-U.S. KPNQwest's Board's meetings.  See id. ¶¶ 23, 25, 28.

In response to Plaintiffs' Complaint, Defendants' Motion asserts that (1) one group of Plaintiffs' allegations is, effectively, a Racketeer Influenced and Corrupt Organizations ("RICO") claim "expressly barred by the Private Securities Litigation Reform Act of 1995 ('PSLRA')," 18 U.S.C. § 1964 (c), Mot., Mem. at 1, and (2) all other claims are

> Dutch law claim[s that belong in] the Netherlands, where
> KPNQwest was organized and headquartered[,] and where a
> Dutch court oversees its bankruptcy . . . .  The events
> preceding KPNQwest's bankruptcy are already the subject
> of a separate litigation, an arbitration, and an
> investigatory proceeding that are all pending in the
> Netherlands.

Mot., Mem. at 2.  Defendants further state that, regardless of whether or not the RICO claim is deemed viable,[6] Defendants are

---

[6]    This Court expresses no opinion as to whether Plaintiffs' RICO claim is viable or not.  See Alnwick v. European Micro Holdings, Inc., 29 Fed. Appx. 781, 784 (2002) (citing Gilbert and noting that a district court should not consider the viability of the claims on a motion to dismiss for forum non conveniens).  On September 28, 2006, in response to Plaintiffs' Amended Complaint, Defendants notified this Court of Defendants' intent to file a supplemental brief with respect to Defendants' instant Motion, see Docket Entry No. 85, apparently to address Plaintiffs' elaboration on the RICO

entitled to dismissal on the grounds of forum non conveniens since:
(1) "this case is about the demise of a Dutch company that did
business in the Netherlands, not in New Jersey," id. at 10; (2) "the
majority of the relevant documents and witnesses are in the
Netherlands," id.; (3) "the Netherlands [has interest in] resolution
of the issues relating to the causes of KPNQwest's bankruptcy, [and]
certain Dutch KPNQwest['s] shareholders have [already] initiated
proceedings [against the Defendants named in this action, as well
as against numerous Dutch parties, like KPNQwest's accountants,
auditors, controlling banks and KPNQwest's Dutch officers and
directors] before . . . a commercial [division of the] court in the
Netherlands [on the basis of] allegations of corporate
mismanagement," the very claim set forth in the case at bar, id. at
10-11 (citing Decl. of Maarten Das ¶ 9 (hereinafter "Das Decl."));[7]

_____

claim.  However, this Court *cannot* sever the case into "local" and
"foreign" claims for the purpose of (1) dismissing the RICO claim
as a matter of law, and then (2) dismissing the remaining Dutch law
claims on the grounds of forum non conveniens.  Compare Mot. at 2,
9-10 (suggesting exactly that scenario).  "[T]he doctrine of forum
non conveniens is intended to avoid trial in inappropriate forums,
not to avoid meritless suits," and could be employed *only* with
respect to the entire case, not individual claims.  Alnwick, 29
Fed. Appx. at  784 (citing Manu Int'l, S.A. v. Avon Products, Inc.,
641 F.2d 62, 68 (2d Cir. 1981)); Lockman Foundation v. Evangelical
Alliance Mission, 930 F.2d 764, 770 (9th Cir. 1991) (citing Contact
Lumber Co. v. P.T. Moges Shipping Co., 918 F.2d 1446, 1452-53 (9th
Cir. 1990)).

        [7]
        Defendants' submission is accompanied by Declaration of Mr.
Maarten Das, "an attorney with the law firm of Loyens and Loeff
N.V., [located in] Amsterdam, Netherlands."  Das Decl. ¶ 1.  Mr.
Das holds a legal degree from the Vrije Universiteit of Amsterdam
and is the head of the Litigation Department of the Corporate

and (4) Plaintiffs, Dutch attorneys, have no interest in pursing their claims in New Jersey. See id. at 11.

## DISCUSSION

**I.   Doctrine of Forum Non Conveniens**

Forum non conveniens is Latin for "inconvenient forum." The common law doctrine of forum non conveniens arose from the doctrine of forum non competens developed in Scotland in the early 19th century as a discretionary device designed to allow trial courts to decline to exercise jurisdiction when it appeared that the convenience of the parties and the interests of justice would be better served if another court heard the action. Similarly, the modern doctrine of forum non conveniens is a common law principle

---

Practice Group at his firm. Id. ¶¶ 3-4.

With respect to the Dutch proceedings initiated by the Dutch shareholders (hereinafter "De Vereniging van Effectenbezitters Proceedings" titled after the lead plaintiff in that matter), the Declaration provides an exhaustive list of parties already involved or expected to be involved in that action, see Das Decl. ¶¶ 10, 12 (naming the total of 47 parties, all of which, except for the Defendants in this action, are located either in the Netherlands or in the United Kingdom), and explains that the Dutch court also ordered Plaintiffs to appear in that action. Id. ¶ 11.

Moreover, on September 13, 2006, KPNQwest's lenders and their assignees initiated another action in the Netherlands against three of the Defendants in this action (a) raising virtually the same claims as those presently asserted by Plaintiffs and, in addition, (b) naming other defendants, six of whom are residing in Netherlands, one in the United Kingdom, and six in the United States (specifically, in the states of Colorado, New York, Missouri, Georgia, New Jersey and Virginia). See Letter from Thomas C. Curtin of Sep. 13, 2006, Ex. Cargill Financial Markets, PLC. And Citibank, N.A., v. KPN Telecom B.V., et al. (hereinafter "Cargill Financial Proceedings").

that gives courts the discretion to decline exercising jurisdiction over certain cases where the underlying principles of justice and convenience favor dismissal. In 1947, the United States Supreme Court announced the factors to be considered in applying the doctrine of forum non conveniens in Gulf Oil Corp. v. Gilbert, 330 U.S. 501. In 1981, the Court further explained the doctrine in Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981).

The Piper decision responded to the world's legal and economic developments. See id. at 244-49. The Court in Piper addressed foreign forum shoppers by giving little deference to their decision to litigate in the United States and redefined the doctrine as a balancing test. See id. at 249-50. Basically, the Piper Court utilized a two-prong analysis: (1) whether an adequate alternate forum was available; and (2) if so, whether the balancing of the private and public convenience factors weighed heavily in favor of litigation in the alternate forum.[8] See Piper, 454 U.S. at 247-52. The defendant, as the moving party, bears the burden of proof on both these matters. See id. at 258 ("Of course, defendants must provide enough information to enable the District Court to balance the parties' interests"). Once the defendant has satisfied the threshold requirement by illustrating that an adequate alternate forum is available, the courts should balance convenience interests.

---

[8]

The availability of an adequate alternate forum was a threshold requirement; consequently, if it was not met, dismissal could not be proper. See Piper, 454 U.S. at 254, n.22.

See id. at 247-52.  When considering this second prong, the courts utilize the balancing test introduced in Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947), which was later reaffirmed in Piper.  See Piper, 454 U.S. at 248-52, 255-56.  In a nutshell, the courts weigh the potential burden of litigation on the parties and on the chosen forum against dismissal.  See id. at 255.  The Court in Gilbert categorized the convenience factors pertaining to the parties as private interests and those relating to the forum as public interests.[9]  See id. at 241 n.6 (discussing the Gilbert decision). If an adequate alternate forum is available and these private and public interests favor dismissal, the court will grant the motion for dismissal under the doctrine of forum non conveniens.  See id. at 241.

The courts, however, do not conduct their analysis in a vacuum. They conduct their balancing in light of the degree of deference the plaintiff's choice of forum deserves.  The court's deference for the plaintiff plays a significant role in defining the weight of the defendant's burden in satisfying the second prong.  See id.

----

[9]

In Gulf Oil Corp. v. Gilbert, 330 U.S. 501, and Koster v. Lumbermen's Mutual Casualty Co., 330 U.S. 518, two 1947 cases, the United States Supreme Court established the framework for forum non conveniens analysis by setting forth the private and public interest factors to be considered in the discretionary application of the doctrine.  These interests include: (1) the relevant public and private interests; (2) the relative ease of access to sources of proof; (3) the availability of compulsory process for the attendance of unwilling, and the cost of obtaining attendance of willing witnesses; and (4) the ease, speed, and expense of trial; and (5) the enforceability of judgment, if obtained.

Generally, courts view the plaintiff's choice of forum with great deference.  See id. at 255.  Where a plaintiff sues in plaintiff's home forum, it is presumed that the plaintiff chose the forum for the sake of convenience.  See id. at 255-56.  The defendant may rebut this presumption, however, and a court may exercise its discretion to dismiss the case where: (1) an alternative forum with jurisdiction over the case exists; and (2) to litigate in the plaintiff's chosen forum would result in "oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience," or where the court's "administrative and legal" concerns make the chosen forum inappropriate.  See id. at 241 (quoting Koster, 330 U.S. at 524).  Alternatively, since the deference for the plaintiff's choice of forum is grounded in considerations of convenience, the defendant may overcome this presumption in favor of the plaintiff's choice by showing that a balancing of the private and public interest factors "clearly points towards trial in the alternative forum."  See id. at 255.

Conversely, in accordance with the doctrine of forum non conveniens and its objective to "ensure that the trial is convenient, a foreign plaintiff's choice [of forum] deserves less deference [than that of an American plaintiff]."  Piper, 454 U.S. at 256. It is rational to assume that U.S. plaintiffs choose their home forum for the sake of convenience, but that is not the case when a foreign plaintiff chooses an American jurisdiction.  See id.

To the contrary, such suits are counterintuitive in terms of convenience. Consequently, courts are suspicious that a foreign plaintiff's decision to bring suit in the United States is motivated by a search for a jurisdiction with laws that would be the most favorable for the claim. See Swift & Co. Packers v. Compania Colombiana del Caribe, S.A., 339 U.S. 684, 697 (1950) ("Suit by a United States citizen against a foreign respondent brings into force considerations very different from those in suits between foreigners"). Indeed, the Court in Piper rephrased its earlier holding in Gilbert to explicitly address plaintiffs "shopping" for a forum.[10] See Piper, 454 U.S. at 249 n.15 & 252 n.19. It stated

---

[10]
American courts are appealing to foreign plaintiffs. With so many American states to choose from, the number of inviting jurisdictions is abundant, and since each applies its own choice-of-law rules, the forum shopping plaintiff can find just the right fit. Another appealing aspect of American courts is the availability of jury trials, in comparison to civil law jurisdictions. See Piper, 454 U.S. at 252 n.18. In addition, litigation in U.S. courts is more affordable because plaintiffs have the option of using contingent fees, which are rarely available in foreign jurisdictions. See id. Furthermore, absent fee shifting statutes or sanctions for misconduct, U.S. courts do not impose a monetary penalty in the form of attorney's fees on the losing party, see id., a practice common to civil law courts. Moreover, unlike common law legal regimes, civil law jurisdictions allow nether punitive nor treble damages. See Michael Van Hoof, Will the New European Union Competition Regulation Increase Private Litigation? An International Comparison, 19 Conn. J. Int'l L. 659 (2004); Mathias Reimann, Liability for Defective Products at the Beginning of the Twenty-First Century: Emergence of a Worldwide Standard?, 51 Am. J. Comp. L. 751 (2003). Finally, the United States is a more attractive forum because of the extensive discovery process unavailable in civil law jurisdictions. See Piper, 454 U.S. at 252 n.18. All in all, these qualities of U.S. courts make them a prime choice for plaintiffs seeking damages from around the world, and Plaintiffs in this case expressly state

that dismissal under forum non conveniens may be "warranted where a plaintiff chooses a particular forum[] not because it is convenient, but solely in order to harass the defendant or take advantage of favorable law." Id. at 249 n.15. To illustrate, the Court in Piper noted that an appointed representative of a foreign estate is presumed to take advantage of the American courts if the action is filed in U.S. mainly because of the legal standards available here.[11] See id. at 239-40 & n.3, 242.

As the doctrine stands now, the threshold requirement in any forum non conveniens dismissal is still the availability of an adequate alternative forum. See id. at 254 n.22. Two conditions must be satisfied to meet this adequacy requirement: (1) the defendant must be amenable to process in the alternative forum, and (2) the subject matter of the lawsuit must be cognizable in the

─────────────────

Plaintiffs' preference for having a jury--rather than a bench--trial, see Opposition at 20, and for engaging in an extensive--rather than in a limited--discovery. See id. at 18.

[11]   The Second Circuit, in Iragorri v. United Technologies Corp., 274 F.3d 65 (2001), stated that the degree of deference due to plaintiff's choice of forum moves along a "sliding scale," depending on the circumstances of each case. Id. at 71. Plaintiff's choice of forum receives greater deference when it is motivated by "reasons that the law recognizes as valid," and the plaintiff has a "bona fide connection" with the United States and the chosen forum. See id. at 72. Consequently, the more reasons plaintiff gives the court to assume that plaintiff's choice was based on convenience, the steeper defendant's uphill battle will be to overcome the court's deference for plaintiff's choice. See id. If, however, plaintiff's choice of forum cannot be supported by "bona fide connections," the choice of forum warrants less deference and it will be easier for defendant to prevail on a motion to dismiss.

alternative forum in order to provide the plaintiff with a redress. See id.; Lacey v. Cessna Aircraft Co., 862 F.2d 38, 44 (3d Cir. 1988); Kultur Int'l Films v. Covent Garden Pioneer, FSP., 860 F. Supp. 1055, 1063 (D.N.J. 1994). In "rare circumstances" where the remedy available in the other jurisdiction is "clearly unsatisfactory," the threshold requirement will not be met, and the court will find dismissal improper. See Piper, 454 U.S. at 254; compare Tom McNamara, International Forum Selection and Forum Non Conveniens, 34 Int'l Law. 558, 560-61 (2000) (providing the list of the 13 foreign forums that U.S. courts have consistently deemed as adequate alternate forums in 1999: Canada, Cayman Islands, Columbia, France, Germany, Greece, Hong Kong, Liechtenstein, Netherlands, Pakistan, Peru, Switzerland, and the United Kingdom). Hence, while the foreign forums completely prohibiting any meaningful "litigation of the subject matter" disputed cannot qualify as adequate alternatives, Piper, 454 U.S. at 254 n.22, the unavailability of a certain theory for recovery or the possibility of lesser damages cannot render the alternate forum inadequate.[12] See id. at 255. For example, the Court in Piper held that the alternate forum was

---

[12]

    True, differences in the laws may affect the likelihood of recovery. Therefore, plaintiffs frequently argue that the less favorable laws that apply in an alternate forum render that alternate forum "inadequate." Such disparities between the laws of the chosen and alternative forums, however, do not render the alternate forum inadequate. See Piper at 250. The "unfavorable" laws of the alternate forum may be given substantial weight only if the laws render the available remedy "so clearly inadequate or unsatisfactory that it is no remedy at all." Id.

not inadequate where there was "no danger that [plaintiffs would] be deprived of any remedy or treated unfairly." Id.  In sum, the first prong of the forum non conveniens doctrine does not obligate the courts to "conduct[] complex exercises in comparative law." Id. at 251.  In fact, the Piper Court favored dismissal where the court would have to engage in "untangling problems in conflict of laws, and in law foreign to itself."[13]  See id.

---

[13]

While the Supreme Court in Piper did not address the issue of international treaty-based treatment of foreign national plaintiffs in U.S. courts, the Second Circuit in Iragorri stated that the court's "analysis [should be] mindful of those considerations." Iragorri, 274 F.3d at 69 n.2.  In Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64 (2d Cir. 2003), the Second Circuit reaffirmed its earlier assertion that a court must consider relevant treaty obligations when reviewing a forum non conveniens motion.  See id. at 76-77.  First, the court must determine whether the treaty entitles the foreign plaintiffs to a general access to American courts.  See id. at 72.  Then, the treaty should be examined to determine whether the court should afford the foreign plaintiff the same deference it gives U.S. plaintiffs who choose to litigate in their home forums.  See id. at 72-73.  Courts must adhere to the "explicit" provisions of a treaty, meaning that a court will view a foreign plaintiff's choice of the U.S. forum with little deference where the treaty simply provides for "reciprocal free access" to the courts and does not explicitly provide for "access to each country's courts on terms no less favorable than those applicable to nationals of the court's country." Id.  In other words, a treaty that calls for "freedom of access" cannot be construed to provide "national access" and will only "merit[] the lesser degree of deference typically afforded foreign plaintiffs." Id. at 73.  Thus, courts should limit the number of foreign plaintiffs they treat with the deference due to U.S. plaintiffs to cases where the applicable treaties explicitly provide for national access. Id. at 72, see also Irish Nat'l Ins. Co., Ltd. v. Aer Lingus Teoranta, 739 F.2d 90, 91-92 (2d Cir. 1984) (stating that "under the terms of a separate treaty between the United States and Ireland, appellant was entitled to national treatment with respect to . . . having access to the courts of justice") (internal quotation marks omitted).

The second prong is currently summarized as the sum of two multi-element inquiries.  The public interests to be considered include: (1) having local disputes settled locally; (2) avoiding problems of applying foreign law; and (3) avoiding burdening jurors with cases that have no impact on their community.  The private interests embrace: (1) ease of access to evidence; (2) the cost for willing witnesses to attend trial; (3) the availability of compulsory process; and (4) other factors that might shorten trial or make it less expensive. <u>See</u> <u>Capital Currency Exch. v. National Westminster Bank PLC</u>, 155 F.3d 603, 609 (2d Cir. 1999) (citing <u>Piper</u>, 454 U.S. at 241; <u>Gilbert</u>, 330 U.S. at 508); <u>Hoffman v. Goberman</u>, 420 F.2d 423 (3d Cir. 1970); <u>see also</u> <u>Dole Food Co. v. Watts</u>, 303 F.3d 1104, 1119 (9th Cir. 2002).  The inquiry conducted by the court must be detailed and fact-specific, since forum non conveniens remains an exceptional tool to be employed sparingly. <u>See</u> <u>Tech. Dev. Co. v. Onischenko</u>, 174 Fed. Appx. 117, 121 (3d Cir. 2006).

II. **Application of the Doctrine to the Case at Bar**

A.   DEGREE OF DEFERENCE TO PLAINTIFFS' CHOICE OF FORUM

Prior to examining the forum non conveniens factors expressly set forth in <u>Piper</u> and <u>Glibert</u>, this Court should approximate the

degree of deference due to Plaintiffs' choice of forum.   "Where .
. . the plaintiff is foreign, the amount of deference is potentially
less because a court cannot assume that the forum was chosen based
on convenience factors." <u>Onischenko</u>, 174 Fed. Appx. at 120-21
(citing <u>Piper</u>, 454 U.S. at 255-56).   However, <u>Piper</u> is "not an
invitation to accord a foreign plaintiff's selection of an American
forum no deference," <u>Lacey v. Cessna Aircraft Co.</u>, 862 F.2d 38, 45-
46 (3d Cir. 1988) (internal quotation omitted), and "where a foreign
plaintiff has made a strong showing of convenience, . . . the
district court must indicate how far that showing goes toward
putting the foreign plaintiff on the same footing as a domestic
plaintiff." <u>Lony v. E. I. Du Pont de Nemours & Co.</u>, 886 F.2d 628,
634 (3d Cir. 1989).

     In the case at bar, there appears to be no dispute that
Plaintiffs, Dutch attorneys appointed by a Dutch court to act as
bankruptcy trustees for a Netherlands-based entity, are indeed
foreign plaintiffs that have neither personal nor business contacts
with United States or the State of New Jersey.[14]   Such lack of
contacts, while indeed an important factor, does not, however, mean
that this Court cannot accord significant weight to Plaintiffs'

--------

[14]
     This Court is aware of no bilateral or multilateral Treaty of
Peace, Friendship, Navigation and Commerce (hereinafter "FNC
treaty") granting the Netherlands nationals "national treatment"
for the purposes of access to this nation's courts, and Plaintiffs
similarly do not assert that, under any FNC treaty, Plaintiffs
qualify for "national access."

forum selection, since a foreign plaintiff without a connection to
the forum, while not entitled to the same deference as a domestic
plaintiff who chooses his home jurisdiction, does not automatically
receive the lowest level of deference.  <u>See</u> <u>Onischenko</u>, 174 Fed.
Appx. at 122 (citing <u>Lacey v. Cessna Aircraft Co.</u>, 932 F.2d 170 (3d
Cir. 1991), <u>Lony</u>, 886 F.2d 628, and <u>Norex Petroleum, Ltd. v. Access
Indus.</u>, 416 F.3d 146 (2d Cir. 2005)).  Rather, this Court considers
whether "there is some evidence of convenience, even if it is not
in the form of the foreign plaintiff's direct contacts to the
forum."  <u>Id.</u>

Here, however, there appears to be little evidence of any
convenience to Plaintiffs.  Plaintiffs are legal appointees who seem
to have no intention of moving their personal or business interests
into the United States (or to the state of New Jersey in
particular), and their operation as KPNQwest's bankruptcy trustees
has no connection with the United States but for the litigation at
bar.[15]  <u>See</u> Compl. ¶ 1; <u>compare</u> <u>Onishenko</u>, 174 Fed. Appx. at 122
(suggesting that, when plaintiff is transferring plaintiff's

---

[15]

Indeed, Plaintiffs' interest in the matter are limited solely
by the appointment they obtained from the Dutch court.  When the
original plaintiff J.C. van Apeldoorn resigned from his position as
KPNQwest's bankruptcy trustee, he was substituted by his successor
trustee, Marcel Windt.  <u>See</u> Docket Entry No. 79.  It appears that
Mr. Van Apeldoorn's interest in any litigation in the United States
immediately extinguished upon his resignation, and that Mr. Windt's
interests in such litigation arose only upon Mr. Windt's
appointment and are likely to continue just as long as Mr. Windt's
appointment lasts.

business to the United States, plaintiff's intention to make the United States plaintiff's home and key place of operation should be considered as an indication of certain plaintiff's conveniences for the purpose of initiating a law suit in the United States).

In addition, there is no doubt that Plaintiffs can bring this action in the Netherlands, their home jurisdiction, and do so with confidence that the local court would entertain the action, and that jurisdiction over Defendants would be properly obtained, since a related action (De Vereniging van Effectenbezitters Proceedings) was already pending against Defendants in the Netherlands at the time when Plaintiffs commenced the instant case.  <u>See</u> Das Decl. ¶¶ 9-11, 14-17 (listing applicable legal bases under the Dutch law); <u>see</u> <u>also</u> Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters, 20 U.S.T. 361, 658 U.N.T.S. 163.[16]

---

[16]
  The treaty opened for signature November 15, 1965.  Both the United States and the Netherlands are among the twenty-seven ratifying signatories of the treaty which is deposited for custodial holding at the Ministry of Foreign Affairs of the Netherlands.

In fact, the De Vereniging van Effectenbezitters Proceedings,[17] as well as the Cargill Financial Proceedings[18] filed against Defendants on September 13, 2006, see note 4, supra, and the ongoing Dutch bankruptcy proceedings of KPNQwest, underscore the unusual scenario presented in this case.  It is illogical for a bankruptcy trustee to assert that it would be more convenient to bring an action thousands of miles away, while this trustee: (a) has to play

---

[17]

    Plaintiffs appear to assert that the nature of claims in these Proceedings is unrelated to the case at bar, since one of the litigations (presumably De Vereniging van Effectenbezitters Proceedings) is an insurance coverage case. See Opposition at 29. However, Plaintiffs' points are of little relevance to the issue at hand, since Defendants do not assert that the instant case should be dismissed as duplicating an ongoing case in the Netherlands.

[18]

    Plaintiffs' submissions do not clarify the caption and index of the insurance coverage case, see note 17, supra.  To make matters more confusing, Plaintiffs also assert that a certain other litigation is a petition for "investigatory proceeding," not a law suit.  See Opposition at 29.  It is not entirely clear to this Court whether this "investigatory proceeding" is the one that has become the Cargill Financial Proceedings on September 13, 2006.  In any event, the Cargill Financial Proceedings are, indeed (1) a law suit, and (2) set forth claims virtually identical to those raised by Plaintiffs.  Finally, the Court notes in passing that Plaintiffs' assertion that an  "investigatory proceeding" in the Netherlands cannot be a law suit is erroneous in the sense that an investigatory process is an indelible part of civil law legal proceedings since, in civil law jurisdictions, the legal system is inquisitory (rather than adversarial, as it is in common law jurisdictions) and, hence, has to involve an "investigatory process." See, e.g., Russell G. Pearce, Redressing Inequality in the Market for Justice: Why Access to Lawyers Will Never Solve the Problem and Why Rethinking the Role of Judges Will Help, 73 Fordham L. Rev. 969, 971 (2004) (contrasting the inquisitorial system where judges are experts who "conduct investigations, initiate cases, determine the issues, and control the presentation of evidence" with the adversarial system, where lawyers "search for justice" and initiate cases upon their clients' behalf).

a part in the related bankruptcy proceedings in his home forum, and (b) has his defendants already brought into his home forum on two other actions which are nearly identical in nature to the action the trustee desires to pursue, and in one of which the trustee has already been ordered to appear.  Since one can hardly perceive any convenience in having multiple massive litigations on both sides of the Atlantic, this Court discerns little evidence of convenience to Plaintiffs in Plaintiffs' decision to file this action with this Court and, thus, accords Plaintiffs' forum selection a low degree of deference.  See Onischenko, 174 Fed. Appx. at 122.

B.   AVAILABILITY OF AN ADEQUATE ALTERNATIVE FORUM

In order to establish whether the Netherlands present an adequate alternative forum, Defendants should show that: (1) Defendants are amenable to process in the Netherlands, and (2) the subject matter of Plaintiffs' lawsuit is cognizable in the Netherlands and provides Plaintiffs with a redress.  Defendants made both of these showings.

There appears to be no dispute that Defendants could, and were, served with process by entities having similar legal status as Plaintiffs in both De Vereniging van Effectenbezitters Proceedings and Cargill Financial Proceedings, see Das Decl. ¶¶ 9-10; Letter of Thomas R. Curtin of September 13, 2006, Ex. Cargil Financial Proceedings; and Plaintiffs' Opposition is silent as to Plaintiffs' inability to serve or any hardship with respect to serving

Defendants with process if Plaintiffs were to initiate a Dutch action.

Moreover, Defendants aver, by and through the Declaration of Mr. Das, that

> [i]f [Plaintiffs-]Trustees were to sue [Defendants] in the Netherlands under [theories fostered by Plaintiffs in the instant action, and] Defendants are domiciled in the United States, all Defendants would be subject to the jurisdiction of the Courts of the Netherlands. [In addition,] Qwest, as an alleged de facto policymaker in KPNQwest, a Dutch company, would be subject to the jurisdiction of a Dutch court on the basis of . . . Section 2:138 [of Dutch Civil Code] in conjunction with Section 2:131 [of Dutch Civil Code] or Section 6 [of Dutch Code of Civil Procedure].

Das Decl. ¶¶ 13-14; accord TH Agric. & Nutrition, L.L.C. v. Ace European Group, Ltd., 416 F. Supp. 2d 1054 (D. Kan. 2006) (where a Delaware company having its principal place of business in Kansas litigated against 13 European insurance companies, the court dismissed the lawsuit in favor of the Netherlands because a similar suit had already been filed in the Netherlands).

With respect to the second prong of the adequacy of the alternative forum test, Defendants similarly aver, by and through Declaration of Mr. Das, that

> Dutch law recognizes causes of action for fraud and mismanagement. A claim by a trustee in bankruptcy against the managing and supervisory directors would generally be based on Sections 2:9 and 2:149 Dutch Civil Code ("DCC") (internal liability of the managing directors and supervisory directors vis[-]à[-]vis the company) or on Sections 2:138 and 2:149 DCC (external liability of the managing directors and supervisory directors vis[-]à[-]vis the estate of the bankrupt company). . . . Dutch law [also] recognizes a cause of action for contribution (vrijwaringsvordering) against

third parties on the basis of Section 210 Dutch Code of
Civil Procedure . . . .  [The] claims of corporate
mismanagement [are filed with] the Enterprise Chamber of
the Amsterdam Court of Appeals ("EC") . . . .  The EC is
a specialized court with jurisdiction to investigate
claims of corporate mismanagement of Dutch corporations.
[While] damages cannot be claimed before the EC,
[damages] can be claimed in subsequent legal proceedings
before a Dutch district court.

Id. ¶¶ 6-7, 9.

In view of this evidence, this Court concludes that the

Netherlands presents an adequate alternative forum for Plaintiffs'

action.[19]  See Tom McNamara, International Forum Selection and Forum

Non Conveniens, 34 Int'l Law. 558, 560-61 (2000) (listing the

_____

[19]

Moreover, it appears that, under the Dutch law, non-Dutch
parties would be able to join Plaintiffs in their Dutch action
against Defendants.  See R.D. Kollewijn, American-Dutch Private
International Law 30 (2d ed. 1961); Van Rene van Rooij & Maurice V.
Polak, Private International Law in the Netherlands 50, 53 (1987);
J.P. Verheul, Private International Law, in Introduction to Dutch
Law for Foreign Lawyers 263, 280 n.88 (D.C. Fokkema et al. eds.,
1978).
Finally, there is little doubt that Plaintiffs would be able
to enforce the award, if such is rendered in their favor by the
Dutch court, in the United States.  The United States professes
liberal policies with respect to foreign judgments in most
situations.  See generally Uniform Foreign Money Judgments
Recognition Act, 13 U.L.A. 263 (1986) (setting forth liberal
policies for accepting foreign judgments).  The Uniform Foreign
Money Judgments Recognition Act is currently accepted in thirty
states, the District of Columbia and the Virgin Islands.  See
Uniform Law Commissioners, A Few Facts About the Uniform Foreign
Money Judgments Recognition Act (listing current status of
acceptance of the Act), available at <<http://www.nccusl.org/nccusl
/uniformactfactsheets/uniformacts-fsufmjra.asp>>;  Restatement
(Third) of Foreign Relations 481-486 (1987) (generally paralleling
relevant provisions within the Uniform Foreign Money Judgments
Recognition Act); Restatement (Second) of Conflict of Laws 98
(1971) ("A valid judgment rendered in a foreign nation after a fair
trial in a contested proceeding will be recognized in the United
States").

Netherlands as the forum consistently found adequate for the purposes of forum non conveniens dismissals); <u>accord</u> <u>Empresa Lineas Maritimas Argentinas, S.A. v. Schichau-Unterweser, A.G.</u>, 955 F.2d 368 (5th Cir. 1992) (affirming dismissal in favor of the Netherlands on the grounds of forum non conveniens); <u>Veba-Chemie A.G. v. M/V Getafix</u>, 711 F.2d 1243 (5th Cir. 1983) (same); <u>Morales v. Ford Motor Co.</u>, 313 F. Supp. 2d 672 (S.D. Tex. 2004) (dismissing in favor of the Netherlands on the grounds of forum non conveniens); <u>Bouvy-Loggers v. Pan Am. World Airways, Inc.</u>, 1978 U.S. Dist. LEXIS 18792 (S.D.N.Y. Mar. 27, 1978) (same); <u>see also</u> <u>Alnwick v. European Micro Holdings, Inc.</u>, 281 F. Supp. 2d 629, 647 (E.D.N.Y. 2003) ("It is undisputed that the Netherlands is an adequate alternative forum").

C.   BALANCE OF PUBLIC INTERESTS INQUIRY

The public interests to be considered include: (1) having local disputes settled locally; (2) avoiding problems of applying foreign law; and (3) avoiding burdening jurors with cases that have no impact on their community.   Plaintiffs argue that

> [s]ignificant U.S. interests are at stake in this dispute. . . .   Much of the fraudulent conduct and mismanagement alleged herein occurred in the United States. . . . Moreover, numerous persons or entities with substantial interests in the estate, including creditors and bondholders, reside in the United States.
>
> The United States has a substantial interest in redressing fraud committed from within its borders.   In addition, this Court would be more familiar with the

> relevant law – RICO – which is a unique U.S. statutory
> provision.   Although [Plaintiffs] assert a Dutch law
> claim, "more than half of the complaint involves RICO
> claims that are governed by federal law . . . ."

Am. Compl. at 9-10; Opposition at 27-28.

It appears that Plaintiffs misread the applicable tests.  The interest of having local disputes settled locally: (1) should be read jointly with that of avoiding burdening jurors with cases that have no impact on their community, and (2) focuses on the nature of the dispute and the effect that the outcome might have on the community of the *local* jurors.  The gist of the case at bar concerns the allegations of fraud and mismanagement of a Dutch business entity by a board member and executives of *that* corporation, and by *that* corporation's controlling holder.  The fact that two of these defendants are domiciled in the state of New Jersey does not transform the case into a "local dispute," nor can the facts that four Board meetings took place somewhere in the United States and Defendants, while being present in the United States, took part in five international conference calls, transform the case into an "American" dispute.   If this Court were to find otherwise, any business transaction involving a meeting in the United States, a telecommunication from the United States or an American executive would automatically be "Americanized" for the purposes of litigation if the transaction eventually goes sour, making the United States federal court system the surrogate court for the entire modern world global economy.

Page 24 of  50

The interest of having disputes settled locally and avoiding burdening jurors with cases that have no impact on their community focuses on the effect that the resolution of the case would have on the *local* community, its citizenry, its domestic financial markets, and so on. Therefore, the United States and the community of the District of New Jersey have little interest in the resolution of this case.[20]  Compare Dole Food Co. v. Watts, 303 F.3d 1104 (9th Cir. 2002) (where a local corporation alleged that the officers had engaged in an elaborate scheme to defraud it, the court found that

_____

[20]
          Plaintiffs assert that, "[w]hile KPNQwest kept its books in accordance with Dutch generally accepted principles ('Dutch GAAP', which required the record to be 'true and fair' reflection of the company's financial condition, KPNQwest published its reports in accordance with United States generally accepted accounting principles ('US GAAP') and purported to make its financial disclosure in accordance with the laws of the United States." Compl. at 11. Leaving aside the ambiguity of Plaintiffs' allegation that KPNQwest "purported to make its financial disclosure in accordance with the laws of the United States" without clarification as to whether KPNQwest succeeded in these efforts, this Court finds Plaintiffs' argument irrelevant to the inquiry at bar, since US GAAP, one of the most stringent set of accounting rules in the world, as well as the strict regulatory regime set forth by United States securities laws and the rigorous rules of American stock exchanges substantially exceed the accounting and disclosure requirements of their European counterparts. See, e.g., Kenji Taneda, Sarbanes-Oxley, Foreign Issuers and United States Securities Regulation, Colum. Bus. L. Rev. 715 (2003); Roberta S. Karme, Will Convergence of Financial Disclosure Standards Change SEC Regulation of Foreign Issuers?, 26 Brooklyn J. Int'l L. 485 (2000); Christopher J. Mailander, Searching for Liquidity: United States Exit Strategies For International Private Equity Investment, Am. U. Int'l L. Rev. 71 (1997). Thus, Defendants could not have made themselves implicitly amenable to a local litigation by taking advantage of less stringent local rules, since American accounting and disclosure requirements are more stringent than the Dutch ones.

intentional wrongful conduct targeted the economic health of the local community and declined to affirm the dismissal based on the doctrine of forum non conveniens).  Conversely, the Netherlands has strong contacts with this case, since that country has substantial interests in adjudicating claims brought by the trustees of its own corporation (which was created as a joint-venture with another Dutch corporation), especially in view of the bankruptcy effect suffered by the local Dutch community consisting of KPNQwest's employees, shareholders, consumers of KPNQwest's product, as well as KPNQwest's suppliers and creditors.  While indeed there could be creditors and similarly situated parties in the United States, and even in the state of New Jersey, an international dispute, by definition, presumes such scenario.[21]

Finally, Plaintiffs assert that, since some of Plaintiffs' claims are based on RICO, the familiarity of this Court with this "unique . . . statutory provision" renders this Court a more competent forum than the Enterprise Chamber of the Amsterdam Court of Appeals, or a like Dutch court, even though Plaintiffs "assert

---

[21]
    Indeed, had it been otherwise, the forum non conveniens issue would have not surfaced at all.  In case of an international dispute, where interested parties and witnesses are scattered all over the world, the factor of "multinationality" can neither be squarely resolved in favor of any single country nor serve as a decisive element.

a Dutch law claim."[22]    Opposition at 28.    This Court disagrees.
Federal courts have not afforded claims under federal securities law
or RICO any special forum non conveniens treatment, and this Court
has no reason to refuse to following suit.    See Gemini Capital Group
v. Yap Fishing Corp., 150 F.3d 1088, 1092 (9th Cir. 1998)
(dismissing the case involving RICO claims on the grounds of forum
non conveniens); Alfadda v. Fenn, 159 F.3d 41 (2d Cir. 1998)
(same); Lockman Found. v. Evangelical Alliance Mission, 930 F.2d
764, 771 (9th Cir. 1991); Republic of Panama v. BCCI Holdings
(Luxembourg) S.A., 119 F.3d 935, 952 (11th Cir. 1997); Kempe v.
Ocean Drilling & Exploration Co., 876 F.2d 1138, 1143-44 (5th Cir.),
cert. denied, 493 U.S. 918 (1989); Alfadda v. Fenn, 159 F.3d 41 (2d
Cir. N.Y. 1998); Transunion Corp. v. Pepsico, Inc., 811 F.2d 127,
129 (2d Cir. 1987) (per curiam); Tkachyov v. Levin, No. 98 C3120,
1999 WL 782070, at 7-9 (N.D. Ill. Sep. 27, 1999); Trujillo v. Banco
Cent. Del Ecuador, 35 F. Supp. 2d 908, 911-16 (S.D. Fla. 1998); BCCI
Holdings (Luxembourg), S.A. v. Mahfouz, 828 F. Supp. 92, 95-100
(D.D.C. 1993); Capri Trading Corp. v. Bank Bumiputra Malaysia
Berhad, 812 F. Supp. 1041, 1044-46 (N.D. Cal. 1993); Penwest Dev.

---

[22]    It shall be noted, however, that Plaintiffs assert at least
*two legal theories* under Dutch law: mismanagement and breach of
fiduciary duty, and allege that these wrongdoings were made in
violation of *eleven statutory provisions* of the Dutch Civil Code.
See Compl. at 119-20.   It is not entirely clear to this Court why
Plaintiffs designate the RICO statute "unique" and requiring
special expertise, while deeming the eleven statutes of Dutch Civil
Code "commonplace" and requiring no legal savvy.

Corp. v. Dow Chem. Co., 667 F. Supp. 436, 437-38 (E.D. Mich. 1987);
cf. Richards v. Lloyd's of London, 135 F.3d at 1294-96 (upholding
choice of forum clauses to divest federal court of jurisdiction over
the plaintiffs' RICO claims and declaring, in dicta, that even a
potential "loss of RICO claims does not suffice to bar dismissal for
forum non conveniens").

Since: (1) this Court has no reason to believe that it is
better equipped to deal with eleven Dutch statutory provisions than
the Dutch court is to deal with one American statute; (2) the local
New Jersey community has virtually no interest in the dispute, while
the Netherlands' interest in the matter is very substantial; and (3)
local jurors would be improperly burdened by the need to resolve a
matter having no impact on their community, this Court concludes
that the balance of public interests factors heavily favors
dismissal of Plaintiffs' Complaint.


D.   BALANCE OF PRIVATE INTERESTS INQUIRY

The balance of private interests similarly favors dismissal.
The relevant factors to be examined include: (1) ease of access to
evidence; (2) the cost for willing witnesses to attend trial; (3)
the availability of compulsory process; and (4) other factors that
might shorten trial or make it less expensive.

For reasons not entirely clear to this Court, Plaintiffs infuse
into the first prong of the inquiry, that is, the ease of access to
evidence, the question of whether substantial discovery has already

been conducted.  See Opposition at 23.  These matters, however, are
not the same, and the ease of access to documentary evidence means
exactly that: the *ease* of access.  Defendants aver that "[m]ost of
the evidence . . . relating to causation, injury, and damages . .
. is in the Netherlands [not] in New Jersey."[23]  Mot., Mem. at 16.
While conceding that "there may well be some documents . . . in
Qwest's files in Colorado," Defendants maintain that "there are many
more documents . . . held by both Plaintiffs and third-parties . .
. in the Netherlands" and other locations in Europe.  Id. at 17-18
(citing Declaration of Jonathan Sherman, Docket Entry No. 66, Exs.
3-11, listing such documentary evidence as "some two thousand boxes
of paper documents and two terabytes of electronic data (equivalent
to roughly 150 million pages), in a Rotterdam warehouse, documents
of KPNQwest's Dutch parent company, Koninklijke KPN N.V., and
documents of KPNQwest's auditors and financial lenders, the
Netherlands-based financial institutions, as well as affiliates of
Pricewaterhouse-Cooper and Arthur Andersen").

---

[23] Defendants rely on the cases granting dismissal on the grounds
of forum non conveniens stating that, where evidence relating to
causation, injury and damages is located in alternative forums,
dismissal is proper.  Specifically, Defendants rely upon Aquinda v.
Texaco, Inc., 303 F.3d 470 (2d Cir. 2002); De Melo v. Lederle
Laboratories, Div. of American Cyanamid Corp., 801 F.2d 1058 (8th
Cir. 1986); Miller v. Boston Sci. Corp., 380 F. Supp. 2d 443
(D.N.J. 2005); Doe v. Hyland Therapeutics Div., 807 F. Supp. 1117
(S.D.N.Y. 1992); Ledingham v. Parke-Davis Div. of Warner-Lambert
Co., 628 F. Supp. 1447 (E.D.N.Y. 1986).  This Court agrees with
Defendants that the consideration of evidentiary relevance to the
matters of causation, injury and damages is a proper one.

Plaintiffs: (1) counter Defendants' argument by noting that, while "KPNQwest['s documents] are already (or soon will be) in Qwest's hands [and] many of those documents are available electronically[,] . . . Defendants' documents . . . are in the U.S.," in Colorado; and (2) assert that Defendants' "objective is to limit discovery" by transferring the "litigation [to] the Netherlands, where discovery is limited."   Opposition at 23, <u>cf.</u> Reply at 10 ("The parties agree that there are *no* relevant documents in New Jersey," emphasis in original).   Plaintiffs, however, compare apples and oranges, since the concept of "*ease* of access" is not equivalent to that of "scope of discovery."[24]

In fact, the scope of discovery available in the Netherlands is not part of the balance of private interests inquiry, it is part

---

[24]     The actual issue at hand, that is, the *ease* of access to documentary evidence, would not be affected if the case is litigated in the Netherlands, since Plaintiffs would still have to produce or make available for examination all Netherlands-located documents to Defendants, and Defendants would still have to produce or make available for examination all Colorado-located documents to Plaintiffs.   (Defendants aver that "Plaintiffs refused to produce 2,000 boxes of hard-copy documents in the United States, insisting that Defendants must go to the Netherlands to inspect them," even though Defendants were and are willing to "make . . . documents available in either forum."   Reply at 10-11 (citing Second Declaration of Jonathan Sherman, <u>see</u> Docket Entry No. 71)).   The expenses and complexity associated with such production and examination appear to be the same regardless of whether the case is litigated in New Jersey or in Amsterdam.   While this Court has little problem envisioning a scenario where the physical location of evidence might be of paramount importance, e.g., where the case involves a piece of real estate or non-transportable heavy or sensitive machinery, or a bed-ridden injured person, a "paper-trail" case like the one at bar does not appear to be amenable to substantial fluctuations of the "ease of access" factor.

of the inquiry examining the adequacy of the alternative forum. Differences in civil procedure of the competing forums are viewed through the prism of whether there is a "danger that [as a result of the alternative proceedings, Plaintiffs would] be deprived of any remedy or treated unfairly." <u>Piper</u>, 454 U.S. at 255. Concluding otherwise would effectively preclude all forum non conveniens dismissals in favor of any Roman-law-based civil jurisdiction, since all continental European jurisdictions provide for less discovery than that available in common law legal systems. As long as the Dutch legal system provides procedure ample to render a fair decision under the Dutch law, the distinction in the scope of discovery cannot serve as a basis for denial of forum non conveniens dismissal. <u>See</u> <u>Potomac Captial Investment Corp. v. Koninklijke Luchtvaapt Maatschapplj N.V. D/b/a KLM</u>, 1998 WL 92416, at *1 (S.D.N.Y. March 4, 1998) (finding Dutch procedural safeguards adequate and noting that foreign tribunals, including those in the Netherlands, can seek discovery assistance under 28 U.S.C § 1782, which provides such assistance to foreign tribunals, as well as to litigants before those tribunals); <u>see</u> <u>also</u> <u>Doe v. Hyland Therapeutics Div.</u>, 807 F. Supp. 1117, 1124 (S.D.N.Y. 1992) (surveying discovery procedures in Northern Europe, finding these procedures adequate and noting that "the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate").

Finally, if this Court were to entertain Plaintiffs' assertion that the discovery already conducted weighs against dismissal of Plaintiffs' Complaint, the record of this litigation does not support Plaintiffs' assertion.  The record indicates that Defendants vehemently "opposed discovery pending a final ruling on Defendants' motion to compel arbitration[, and only when the] order to engage in discovery [was issued by this Court in response to Plaintiffs' motion to compel discovery, Defendants] complied."[25]  Reply at 10; accord Docket Entry No. 53 (Plaintiffs' motion for discovery commencement); Docket Entries No. 55-56 (Defendants' oppositions to discovery); Docket Entry No. 59 (Plaintiffs' reply to Defendants' opposition to discovery); Docket Entries No. 61-62 (minutes entry for proceeding on the issue of discovery and this Court's ensuing order granting Plaintiffs' motion for discovery.)[26]  It would be

---

[25]

On July 17, 2006, Defendants filed their motion to compel discovery, see Docket Entry No. 73, asserting that Plaintiffs were not cooperating with--or unduly impeding--Defendants' discovery requests.  On August 24, 2006, Defendants filed their motion to compel Plaintiffs to post a security bond, see Docket Entry No. 77, in view of Defendants' (1) right to indemnification under the Articles of KPNQwest, and (2) Defendants' swiftly mounting expenses related to transatlantic discovery.  As of the date of the instant Opinion and accompanying Order, these motions are still pending.

[26]

The order granting Plaintiffs' motion for initiation of discovery was issued on December 23, 2005, nine months *prior* to this Court's final resolution of the issue whether to compel arbitration of the dispute.  See Docket Entry No. 84.  Just two months after this Court ordered the parties to engage in discovery, Defendants filed the instant Motion seeking dismissal of the grounds of forum non conveniens.  See Docket Entry No. 66.

indeed anomalous for this Court to allow Plaintiffs to demand and obtain significant discovery just so Plaintiffs would be able to use the very fact of this discovery as a tool to thwart Defendants' Motion.

The next step in the balance of private interests inquiry is to examine two interrelated questions: (1) what would be the cost for willing witnesses to attend trial, and (2) is there a compulsory process in the Netherlands with respect to unwilling witnesses? The answer to the first question weighs heavily in favor of dismissal in view of the ongoing De Vereniging van Effectenbezitters and Cargill Financial Proceedings, since the bulk of the witnesses desired by Plaintiffs (including those witnesses whom Plaintiffs designate as "central" and "relevant," <u>see</u> Opposition at 23-24), as well as the bulk of third-parties desired by Defendants are either already engaged in these actions or should, and therefore, probably would be engaged in view of the similarity of the claims. Therefore, the commute and lodging expenses associated with the need to call willing witnesses would be equal or less if only the United States-based witnesses are flown to the Netherlands for various Dutch proceedings in comparison with the scenario where: (a) the United States-based witnesses are flown to the Netherlands for the currently pending Dutch proceedings, *plus* (b) the Netherlands-based witnesses are flown to the United States for this Court's proceeding.

The answer to the second question similarly appears to favor dismissal.  Addressing this very issue, Defendants aver, by and through Mr. Das' Declaration, that

> Dutch courts are able and willing to compel testimony of persons located in the United States on the basis of the Hague Convention on [the] Taking of Evidence Abroad in Civil or Commercial Matters ([opened for signatures on] 18[th of] March, 1970)[27] to which both the Netherlands and the United States are parties.  On the basis of this convention, a Dutch court can execute letters of request (rogatory letters) in which they can request the competent authorities in the United States to perform judicial acts in order to collect evidence.

Das Decl. ¶ 7.  Therefore, it appears that Plaintiffs would have no more problem in compelling unwilling United States and European witnesses to take part in Dutch proceedings than Defendants might face in trying to compel unwilling Netherlands-based or other European witnesses to partake in this Court's proceedings.

Finally, the Court shall assess the litigation at bar to determine whether there are any other matters that might affect the balance of private interests by shortening the trial or making it less expensive.  This Court is persuaded by Defendants' argument that, since Defendants can and intend to "assert contribution claims

---

[27]
The Convention, popularly known as "Hague Evidence Convention," 23 U.S.T. 2555, T.I.A.S. No. 7444, providing the opportunity to depose witness located overseas, was signed, inter alia, by the United States, Austria, Belgium, Canada, Denmark, Spain, Luxembourg, Norway, the Netherlands, Portugal, the United Kingdom, Finland, France, Greece, Ireland, Italy, Sweden, Switzerland, Czechoslovakia, and Yugoslavia.  See also, Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters, 20 U.S.T. 361, 658 U.N.T.S. 163.

against third-parties in the Netherlands and elsewhere in Europe[, this Court should] discourage . . . piecemeal litigation [by] favor[ing the] dismissal." Reply at 12-13. Plaintiffs' counter-arguments that: (1) Defendants are yet to sue these third parties, and (2) Defendants could initiate separate suits in the Netherlands against these parties, see Opposition at 23-24, are not persuasive. The fact that the parties intended by Defendants for impleader are already made part to the De Vereniging van Effectenbezitters and Cargill Financial Proceedings suggests the likelihood of Defendants' legal actions against these parties. Moreover, if this Court is to presume that Defendants are to follow Plaintiffs' advice by initiating *additional* related legal actions, the possibility of a mushrooming cluster of suits in the Netherlands only supports dismissal of Plaintiffs' Complaint, so the court in the Netherlands could execute a joinder of actions, thus shortening the trial processes and making them less expensive. In sum, this Court is convinced that the balance of private interests in terms of ease of access to evidence, cost of litigation, compulsory processes and other factors unambiguously favor dismissal of Plaintiffs' Complaint.

    E.   OPPRESSIVENESS AND VEXATION TO DEFENDANTS

Finally, Plaintiffs maintain that Defendants "cannot show that proceedings in this Court would be 'oppressive or vexatious,'"

Opposition at 18, since Defendants have "not shown a practical inability to proceed here." Id. at 20.

Plaintiffs err.  First, an application for dismissal on the grounds of forum non conveniens does *not* require defendant's showing of "inability" to litigate in the inconvenient forum: the "inability" factor was never listed by Piper and Gilbert Courts.

Moreover, under the holding of Piper, the defendant has to make an "oppressive or vexatious" showing *only in case if the plaintiff is suing in plaintiff's home forum*.  See Piper Aircraft Co. v. Reyno, 454 U.S. at 241.  Since there is no dispute that Plaintiffs in the instant action are *not* suing in their home forum, the "oppressive or vexatious" inquiry is inapplicable to the case at bar.  Finally, even if this Court is to hypothesize that this aspect is, somehow, relevant to the case at bar and conduct the applicable inquiry, Plaintiffs' argument is without merit.

Plaintiffs' "oppressive or vexatious" argument is based on the language of the Third Circuit's case, Lony v. E.I. Du Pont de Nemours & Co., 935 F.2d 604 (3d Cir. 1991).[28]  See Opposition at 18-

_____
[28]
    Plaintiffs' two other arguments on this aspect of the inquiry are without merit, since: (1) Plaintiffs assert that the Motion was filed solely by Qwest, even though the remaining Defendants joined the Motion prior to filing of Plaintiffs' Opposition, see Docket Entries No. 68, 69, and (2) Plaintiffs claim that Defendants cannot be deemed "oppressed" because Defendants, while seeking to compel arbitration and stay the instant proceedings, utilized the services of counsel located in District of Columbia and New Jersey.  This second claim is, at the very least, puzzling, since Defendants' usage of foreign counsel with respect to the claim brought under the Federal Arbitration Act would be indeed unreasonable.  Cf.

20.   The Lony Court made the observation restated by the Third Circuit in Onischenko:

> [since] most forum non conveniens cases involve a defendant, sued far from home, arguing against being forced to litigate in a remote forum[, it seems illogical for the defendant to] argu[e] that it would be more convenient for him to defend himself thousands of miles away.

174 Fed. Appx. at 122 (citing Lony, 935 F.2d at 608).

Capitalizing on United States domicile of Defendants, Plaintiffs rely on the language of Lony to assert that, since "[D]efendant[s'] . . . wish[] to defend [themseves] in a forum far from [Defendants'] home jurisdiction[, Defendants' wish] is, as Alice said, 'curiouser and curiouser.'"  Opposition at 20 (internal quotation omitted).   What Plaintiffs fail to observe is that defendants in both Lony and Onischenko were not already involved in other, similarly focused, litigations in foreign jurisdictions. Consequently, the Third Circuit questioned the defendants' interest in litigating the claims thousands miles away.  Conversely, in the case at bar, Defendants are already involved in two litigations in Amsterdam, and in the very same court that would entertain Plaintiffs' Dutch action if Plaintiffs chose to sue Defendants in the Netherlands.  Given these circumstances, it is not surprising that Defendants see Plaintiffs' litigation in New Jersey as "oppressive or vexatious," since Defendants would be forced to

---

Reply at 10 ("The law does not require a defendant to choose between allowing a default to be taken against him or waiving any argument.")

stretch their resources over both sides of the ocean by: (1) hiring different counsel to meet two different sets of bar admission requirements and two different sets of procedural rules; (2) losing the opportunity to seek joinder of actions; (3) flying witnesses and themselves across the Atlantic both ways on regular basis, thus incurring substantial travel and accommodation expenses; and (4) having to translate *all* relevant documents and testimony,[29] etc. Viewed through the prism of conveniences available to Plaintiffs in Plaintiffs' home forum and potential dire exhaustion of Defendants' resources through a cluster of transatlantic litigations, Plaintiffs' action appears to be "oppressive or vexatious," and the balance of the private and public interest factors "clearly points towards trial in the alternative forum," thus, supporting dismissal. See Piper, 454 U.S. at 241, 255 (suggesting two tests for the cases of domestic plaintiff).

---

[29] If the instant action is not dismissed, all documents and testimony in Dutch would have to be translated into English for the use of this Court, while all documents and testimony in English would have to be translated into Dutch for the use of the court in the Netherlands. Hence, there would be no document or testimony left untranslated. If, however, this action is brought in the Netherlands, the translation-related time and expenses would be obviously reduced, perhaps by half, by the need to translate *only* the documents drafted in English.

III.      <u>Other Plaintiffs' Arguments</u>

In addition to the matters discussed <u>infra</u>, Plaintiffs raise two groups of arguments in support of Plaintiffs' opposition to Defendants' Motion.


A.   UNTIMELINESS

One group of Plaintiffs' arguments prompts this Court to deny Defendants' motion as untimely and relies on <u>In re Air Crash Disaster near New Orleans</u>, 821 F.2d 1147 (5th Cir. 1987), <u>vacated on other grounds</u>, 490 U.S. 1032 (1989), and <u>Lony</u>, 935 F.2d 604.[30] <u>See</u> Opposition at 17.  However, the court in <u>Air Crash Disaster near New Orleans</u> expressly observed that "untimeliness will not effect a waiver, [although] it . . . weigh[s] heavily against the granting

_____

[30]
Plaintiffs assert that the court in <u>Lony</u> denied the forum non conveniens motion because "two years have elapsed since the case was filed." <u>See</u> Opposition at 17.  However, the <u>Lony</u> decision does not state exactly that.  Rather, the court in <u>Lony</u> observed as follows:

> The facts that two years have elapsed since the case was filed, there has previously been limited discovery on the forum non conveniens motion, and this was followed after remand by merits discovery for nearly six months present a novel question that does not fit easily into established criteria.  This consideration goes to both private concerns, because of the parties' investment in time and money in discovery, and public ones, because the district court and court personnel already have expended resources in connection with this litigation.

<u>Lony</u>, 935 F.2d at 613.

of the motion [simply] because a defendant's dilatoriness promotes and allows the very incurrence of costs and inconvenience." 821 F.2d at 1165. In fact, Plaintiffs admit that "a defendant must assert a motion to dismiss for forum non conveniens within a *reasonable time* after the facts or circumstances which serve as the basis for the motion have developed and become known or reasonably knowable to the defendant." Opposition at 17 (quoting <u>Disaster near New Orleans</u>, 821 F.2d at 1165) (emphasis supplied).

This Court finds no undue dilatory tactics on part of defendants. Upon initiation of the case at bar, Defendants immediately moved to compel arbitration in London and stay this action, <u>see</u> Docket Entries No. 30-31, which Plaintiffs opposed, <u>see</u> Docket Entry No. 32, and denial of Defendants' motion to compel arbitration was entered by this Court on June 17, 2005, <u>see</u> Docket Entry No. 46, causing Defendants to appeal that order on July 22, 2005, <u>see</u> Docket Entry No. 51, with Plaintiffs' opposition to the appeal being filed on August 22, 2005. <u>See</u> Docket Entry No. 54. The final resolution of the issue whether arbitration in London should be compelled was reached only on September 25, 2006. <u>See</u> Docket Entry No. 84. However, Defendants' motion to dismiss Plaintiffs' Complaint on the grounds of forum non conveniens was filed on February 21, 2006, <u>see</u> Docket entry No. 66, that is, seven months *prior* to the final resolution of the arbitration issue.

It is axiomatic that, since, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983),"a very strong presumption in favor of arbitration of international disputes [exists], even where U.S. statutory claims are implicated," Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 626-27 (1985), and--in view of the interests of judicial economy--the issue whether or not an arbitration should be compelled is always resolved first.  See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 283 (1995). Moreover, if a party fails to demand arbitration of an arbitrable dispute and proceeds with acts and incidents typical to litigation, such conduct usually results in a waiver of the party's right to arbitrate.  See, e.g., Republic Ins. Co. v. PAICO Receivables LLC, 383 F.3d 341, (5th Cir. 2004); Hunt v. Up North Plastics, 980 F. Supp. 1046 (D. Minn. 1997); Ritzel Comm., Inc. v. Mid-American Cellular, 989 F.2d 966, 969 (8th Cir. 1993); Com-Tech Assocs. v. Computer Assocs. Int'l, Inc., 938 F.2d 1574, 1577 (2d Cir. 1991). Therefore, the period of time when this Court was involved in the resolution of the question whether the arbitration should be compelled cannot count against Defendants if Defendants, in good faith, sought an arbitration and stay of the instant proceedings.

Plaintiffs, however, seem to assert that, "if one intends to seek either arbitration, or dismissal on [the grounds of] forum non conveniens, those motions [should be] filed together," Opposition

at 17, and cite four cases in support of that proposition.[31]   <u>See id.</u> n.9.  However, *none* of the cases cited by Plaintiffs implies such a rule.  In fact, in all those cases it was coincidental that the motions to compel arbitration and to dismiss on the grounds of forum non conveniens were filed together, and a prudent litigant may very well wait with a forum non conveniens motion until the resolution of the arbitration issue.[32]  See <u>Garney Cos. v. Southwest</u>

---

[31]

    Specifically, Plaintiffs cite <u>Concat LP v. Unilever, PLC</u>, 350 F. Supp. 2d 796 (N.D. Cal. 2004); <u>Usha (India), Ltd. v. Honeywell Int'l, Inc.</u>, 2004 U.S. Dist. LEXIS 4236 (S.D.N.Y. Mar. 17, 2004); <u>Sandvik AB v. Advent Int'l Corp.</u>, 83 F. Supp. 2d 442 (D. Del. 1999); <u>Ibar Ltd. v. American Bureau of Shipping</u>, 1998 U.S. Dist. LEXIS 7792 (S.D.N.Y. May 22, 1998).

[32]

    Moreover, either the circumstances of these cases or the judicial observations made in these decisions, or both, advocate *against* Plaintiffs' current position.  For instance, in <u>Concat</u>, the court found that the arbitration agreement did apply to the subtle subject matter of the dispute and granted a motion to stay pending arbitration while noting that, had it not been for the arbitration, the action would have proceeded since the doctrine of forum non conveniens did not justify dismissal because the companies, by the act of filing U.S. patent applications, had exposed themselves to the foreseeable possibility of litigation in the United States.  In <u>Usha</u>, the defendant domestic corporations contended that the United States court was an inconvenient forum because the claims at issue all arose under the laws of India and most of the events in issue allegedly occurred there.  Although the plaintiff foreign corporations asserted that India did not provide an adequate alternative forum since the backlog of cases and continuing court congestion indicated that it would take 10 to 15 years for their claims to be adjudicated, the <u>Usha</u> court dismissed the complaint finding the Indian forum adequate.  In <u>Sandvik</u>, the Court noted that the domicile of key witnesses in a certain forum does not render that forum more convenient.  <u>See</u> 83 F. Supp. 2d at 450. Finally, in <u>Ibar</u>, a petition to compel arbitration was granted because petitioners had shown that they had standing to enforce the relevant arbitration agreement.  (The Court notes, in passing, that the forum non conveniens analysis in <u>Ibar</u> is wholly irrelevant to

<u>Water Wells, Inc.</u>, 1992 U.S. Dist. LEXIS 21319 (M.D. Fla. Sept. 14, 1992) (denying motion to compel arbitration on the grounds that the court has already assumed jurisdiction over the case by entertaining the defendant's motion to dismiss on the grounds of forum non conveniens).  While Plaintiffs maintain that Defendants' motion to dismiss on the grounds of inconvenient forum unduly "burden[s] the [C]ourt with extensive proceedings to address that motion" after this Court's denial of Defendants' motion to compel arbitration, <u>see</u> Opposition at 17, Plaintiffs' argument has no merit.  The analysis employed by this Court to establish whether the dispute at hand should be arbitrated was entirely different from that currently employed with respect to the forum non conveniens inquiry.[33] Indeed, if Defendants were to file both motions simultaneously, the burden on this Court would be identical to the one existing, and it was reasonable for Defendants to preserve this Court's resources by first filing the motion to stay.

---

the case at bar, since the issue in <u>Ibar</u> was the transfer of action from one state of the United States, New Jersey, to another state, New York.  Forum non conveniens and 28 U.S.C. § 1404(a), a change of venue provision, differ in their purposes, operation, and consequences; though they have common roots in legislation, they are entirely independent phenomena.  <u>See</u> <u>Piper</u>, 454 U.S. at 253-54.)

[33]    Indeed, this Court's finding that the dispute at hand is not subject to arbitration does not indicate that the dispute cannot be dismissed on the grounds of forum non conveniens, as a ruling to deny forum non conveniens dismissal does not render a dispute necessarily arbitrable.

Therefore, this Court finds Plaintiffs' argument of untimeliness without merit and concludes that Defendants' instant Motion is timely.

B.   CHAPTER 15 and COMITY-BASED CLAIMS

Another group of Plaintiffs' arguments asserts that Defendants' Motion should be denied in view of: (1) "Chapter 15," that is, 11 U.S.C. § 1501, et seq. and, specifically, § 1509, which "facilitates the efforts of foreign bankruptcy trustees to pursue claims in U.S. Courts" and "encourage[s] comity between U.S. and foreign court"; (2) 28 U.S.C. § 1782; and (3) "[t]he significant fact that a Dutch court overseeing the bankruptcy [proceedings of KPNQwest] *expressly* authorized [Plaintiffs] to bring their claims in the U.S," and this "Dutch bankruptcy court's decision is entitled to comity and deference." Opposition at 21-22, 28 (internal quotations omitted, emphasis in original).

Plaintiffs' reasons for so claiming are not immediately obvious to this Court. Fashioned after UNCITRAL's Model Law on Cross-Border Insolvency, Chapter 15 generally applies whenever there is a foreign insolvency proceeding relating to a *debtor* that is subject to a bankruptcy case of some kind in the United States; the reach of the provision is limited to the matters related to *insolvency* proceedings, see 11 U.S.C. § 1501(a) ("The purpose of this chapter is to . . . provide effective mechanisms for dealing with cases of

cross-border insolvency with the objectives of . . . fair and efficient administration of cross-border insolvencies"), and have *no* relevance whatsoever to actions brought under securities, agency or tort law.

Moreover, the "comity" implications of Chapter 15 have no relevance to the case at bar. Because of the enactment of Chapter 15, "[o]nce a foreign bankruptcy proceeding is recognized, a wide range of relief available under American bankruptcy law immediately becomes applicable, including the automatic stay provision in [S]ection 362 of the [Bankruptcy] Code." United States v. J.A. Jones Constr. Group, LLC, 333 B.R. 637, 638 (E.D.N.Y. 2005). The availability of this wide range of relief is effectively a codification of previously existing international "comity" in the area of insolvency proceedings. See Jay Lawrence Westbrook, Chapter 15 at Last, 79 Am. Bankr. L.J. 713, 719 (2005). Since the action at bar is not a bankruptcy proceeding brought in another forum and seeking a stay (or any other related relief) in the United States, this Court finds Plaintiffs' Chapter 15 argument inapposite to the issue of forum non conveniens.

Plaintiffs' decision to rely on 28 U.S.C. § 1782 and on the related statutory interpretation provided in Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241 (2004), see Opposition at 22, is equally puzzling, since both the provision and the Supreme Court's clarification of the statute *undercut* Plaintiffs' opposition to

Defendants' instant Motion.  In Intel, respondent filed an antitrust complaint against petitioner, a competitor of respondent, with a foreign investigative commission and sought a federal court order under § 1782 requiring petitioner to produce potentially relevant documents.  Petitioner, however, contended that § 1782 did not permit respondent to seek discovery for use in the foreign proceedings, since: (1) respondent was a complainant rather than a party in the proceedings, (2) the proceedings were administrative rather than judicial, (3) the foreign commission's investigation was not a pending proceeding, and (4) there was no showing that the material sought by respondent would be discoverable under foreign law.  The United States Supreme Court held that § 1782 provided the district court with authority to entertain respondent's discovery request while noting that, under the statute, the district court was authorized but not required to compel the discovery (since comity and parity concerns could inform the district court's broad discretion).  See Intel Corp., 542 U.S. 241.  In sum, the holding of Intel (as does the language of § 1782) stands to assure that Plaintiffs are likely to have ample access to any evidentiary matters Plaintiffs might need if Plaintiffs are to commence this action in the Netherlands, and Plaintiffs' private interests are unlikely to be negatively affected by this Court's dismissal of this action on the grounds of forum non conveniens.

Finally, Plaintiffs' assertion that this Court should, out of "comity," deny Defendants' Motion because "a Dutch court overseeing

the bankruptcy [proceedings of KPNQwest] expressly authorized [Plaintiffs] to bring their claims in the U.S," Opposition at 28, is similarly bewildering.

Like the concept of public policy in the conflict of laws, the label "comity" can serve as a substitute for analysis. <u>See</u> Paulsen and Sovern, <u>"Public Policy" in the Conflict of Laws</u>, 56 Colum. L. Rev. 969, 1016 (1956). The comity principle was originally developed to explain how a sovereign state, absolutely powerful within its own territory, could give recognition or effect to another nation's *laws* without diminishing or denying its own sovereignty.[34] A legal doctrine, international comity is not a rule of public international law, but the term characterizes many of those same functional elements that define a system of international legal order, it is

---

[34]    The use of the term "comity" to describe a theory for accommodating conflicting legal policies of territorial sovereigns was developed by scholars in 17th-century Holland to resolve conflicts between the laws of the various Dutch provinces. <u>See</u> Davies, <u>The Influence of Huber's de Conflictu Legum on English Private International Law</u>, 18 Brit. Y.B. Int'l L. 49, 52 (1937). The Dutch scholar, Ulrich Huber, set out to reconcile the fact and theory of national territorial authority with the needs of a developing international system in which persons and commerce moved across state lines.  Huber summarized his analysis in three now well-known axioms: (1) the laws of every sovereign authority have force within the boundaries of its state, and bind all subject to it, but not beyond; (2) those are held to be subject to a sovereign authority who are found within its boundaries, whether they be there permanently or temporarily; (3) those who exercise sovereign authority so act from comity, that the laws of every nation having been applied within its own boundaries should retain their effect everywhere so far as they do not prejudice the powers or rights of another state and another state's courts.  <u>See</u> Davies, <u>The Influence of Huber's de Conflictu Legum on English Private International Law</u>, 18 Brit. Y.B. Int'l L. 26 (1937).

a judicial tradition based on respect for sovereignty, a discretionary power of the court to *decline* jurisdiction in international cases out of respect for the actions and laws of another nation, which are weighed against U.S. international convenience and duties, and against consideration for the rights of nationals and others under protection of its law.[35]  See Bodner v. Banque Paribas, 114 F. Supp. 2d 117, 129 (E.D.N.Y. 2000) (citing Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for Southern Dist. Of Iowa, 482 U.S. 522, 555 (1987); Cunard S.S. v. Salen Reefer Serv. AB, 773 F.2d 452, 457 (2d Cir. 1985); Laker Airways Ltd. v. Sabena Belgian World Airlines, 731 F.2d 909, 956 (D.C. Cir. 1984)).  Thus, in Anglo-American law, the extension of comity to another nation is viewed as a unilateral decision of the forum, not as an act required by a rule of the public international system.  See Energy Antimonopoly Act of 1979 (Part 1): Hearings Before the Senate Comm. on the Judiciary, 96th Cong., 1st Sess. 779 (1979) (statement of Monroe Leigh); see also Lorenzen, Story's Commentaries on the Conflict-of-Laws -- One Hundred Years Later, 48 Harv. L. Rev. 15, 35-36 (1934); Nussbaum, Rise and Decline

---

[35]

In addition, the doctrine is also one of local restraint, limiting the application of sovereign power to extraterritorial events and persons.  This second manifestation represents the role played by the doctrine in transnational regulatory cases.  See M. Wolfe, Private International Law 19-20 (2d ed. 1950); Yntema, The Comity Doctrine, 65 Mich. L. Rev. 9 (1966); Lorenzen, Huber's de Conflictu Legum, 13 Ill. L. Rev. 375, 375-77 (1918).

<u>of the Law-of-Nations Doctrine in the Conflict of Laws</u>, 42 Colum. L. Rev. 191 (1942).

This emphasis on the voluntary nature of the doctrine has led to its use to describe an amorphous "never-never" land whose borders are marked by fuzzy lines of politics, courtesy, and good faith. <u>See</u> <u>Somportex Ltd. v. Philadelphia Chewing Gum Corp.</u>, 453 F.2d 435, 440 (3d Cir. 1971). The <u>Somportex</u> court observed that "[c]omity . . . is not a rule of law, but one of practice, convenience, and expediency," <u>id.</u> at 441, and it could be relevant *only* to such matters as legislative acts, executive orders or *dispositive judicial rulings*. <u>See</u> <u>id.</u> No "authorization" to sue in the foreign forum is subject to the discretionary considerations of the comity doctrine, and such authorization certainly cannot be read as a mandate to deny Defendants' Motion. <u>See</u> <u>id.</u> Moreover, the doctrine of comity would prevent the Dutch court from any direct or implied entry of opinion as to how this Court should apply the laws of this nation. Finally, this Court is aware of no provision in the Federal Rules of Civil Procedure--and Plaintiffs enlighten this Court of none--which requires a foreign plaintiff having proper standing and invoking a proper jurisdictional basis to have an "authorization" from the plaintiff's national court in order to either initiate or maintain an action in the United States.

Consequently, this Court finds Plaintiffs' arguments based on Chapter 15 and the concept of comity without merit and irrelevant to this Court's balance of private and public interest factors.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions to dismiss Plaintiffs' Complaint on the grounds of forum non conveniens will be granted with respect to Defendants Qwest Communications International, Inc., John A. McMaster, Robert S. Woodruff and Joseph P. Naccio. Plaintiffs' claims against Defendants 1-10 will be dismissed for lack of prosecution. Defendants' Motion to Compel Plaintiffs to Post a Security Bond, Docket Entry No. 77, will be denied as moot. Defendants' Motion to Compel and to Extend Deadline for Completion of Document Discovery, Docket Entry No. 73, will be denied as moot, and the order that there shall be oral argument as to whether to compel and to extend deadline for completion of document discovery, Docket Entry No. 87, will be vacated as moot.

<u>     s/ Garrett E. Brown, Jr.     </u>
**GARRETT E. BROWN, JR., Chief Judge**
**United States District Court**

Dated: March 27, 2008